Good morning, Your Honors. May it please the Court, my name is David Hagegi on behalf of the petition on Mr. Charlie Fnu. Our contention this morning is that because of the nature and degree of the errors committed by the Board, substantial evidence does not support their denial and instead mandates reversal. As such, we respectfully request Mr. Charlie's petition to be granted. To begin with, the Board not only misapplied the disfavored group analysis, but in doing so, it rendered it useless. The BIA erred by requiring that a member of a disfavored group has to show that he was identified by name. And if you were to take a look at the administrative record on page 4, which is the second full page of the decision, on the last sentence of the third paragraph, however, the respondent's situation is significantly distinguishable from that of Ms. Dial, who was able to prove that she had been identified by name. In this circuit, individualized risk does not mean that one is targeted for harm by people who seek him or her out specifically. As the Court affirmed in Halim v. Holder, the singled-out path is not reserved solely for those applicants whose would-be persecutors seek them out personally by name. Rather, COTACs v. INS recognize that one's chances of being singled out from the general population and subjected to persecution is often strongly correlated with the frequency with which others who share the same disfavored characteristics are mistreated and persecuted. Which brings us to the second error. The BIA erred in ruling that a member of a disfavored group has to be singled out from all other people in his disfavored group rather than from the general population. And we find evidence of that in the third sentence of the fourth paragraph of that decision on administrative record four, page four, where the board says, quote-unquote, he has not articulated any reason why he is any more likely to be harmed than any other person of Chinese ethnicity in Indonesia. And instead what they did, Your Honors, is they came up with this bright-line rule of what is not considered to be persecution. And it's astonishing because the board may not care. I'm sorry. You're talking about the BIA decision rather than the BIA decision? BIA decision. All right. And could you tell me where in the BIA decision? It's at the administrative record, page four, Your Honor. No, no. I have the BIA decision. I apologize, Your Honor. No. Where in the BIA decision are you? For which one are you asking? For where it's singled out against his own group? Yes. That is on the one, two, three, the fourth paragraph. Okay. And if you take a look at the third sentence. All right. Where it starts with he, meaning Charlie, has not articulated any reason why he is any more likely to be harmed than any other person of Chinese ethnicity in Indonesia. May I continue, Your Honor? Yes. Thank you. So is his full name Charlie? Charlie. He only has one name. The FNU is the designation. Right. We should take that off the record, right? Yes, Your Honor. Take it off the docket. It's kind of ridiculous. Yes, Your Honor. First name unknown. Well, Your Honor, in a sense, we leave that there because for identification purposes, work permits, driver's license, so forth, they don't accept one name. So the FNU kind of becomes. Why don't you pick another name? Hopefully, hopefully after this case we will. I mean, it's really. Anyway, there is something weird about this transcript. Every time the government can talk about this, too. But I was reading the transcript. And every time he's I mean, he's been he's being called a lot of names by these various people who accosted him and physically harmed him. It's all untranslated in the record. Every time we come to a place where I mean, where it would show that they were doing this on account of his background. The names are all it says untranslated. What was going on there? There was a error in transcription. But nevertheless, there is we believe that there is enough in there. In his asylum application. In his declaration. Declaration, right. Everything put together, there's enough in there. But what I really want to focus on, Your Honor, is this third error that the board made, which is astonishing. And it's bizarre because they rule that when violence happens in public and the person is not chosen by name, there is no persecution on account of a protected ground. And of course, there is no basis for this. Where did they find it? Where did they say that? They start two paragraphs with that notion on page four. If you look at the first full paragraph, it says, additionally, all five of the incidents that respondent was directly involved in occurred in public places. And then if you skip two paragraphs, the respondent appears to have been randomly selected in each of the incidents which occurred in public places. So what is it? Persecution can only occur in private. Could you imagine at the time of Hitler's Germany that a Jew coming forward and saying that I was selected in public and the board saying, well, no, that's in public. We don't accept that. So it has to be in a private setting. And then the last error is the BIA erred in finding no past persecution where there was credible evidence that Mr. Charlie had been attacked numerous times on account of his ethnicity. And if you look at the second sentence of that fourth paragraph, it says, while the respondent testified that each time the aggressors made derogatory comments about his ethnicity, so they're accepting it. He has not shown that he was individually identified or targeted harm. So your honors, if we go back to the disfavored group analysis, not only he's shown that he's part of the disfavored group, not only he's shown individualized risk, but the board now is requiring him to be singled out by name for it not to be occurring in a public place and for him to show specific harm because they're not accepting harm that is circumstantial. Or if we look at the cases in this circuit in Sinha, the court has recognized that even where the attacks occurred during the course of some other criminal act, ethnic slurs helped to show the attacker's motive was on account of a protected group. Thus, because the board refused to give any weight to the credible evidence of the attacker's motive and because the board improperly required that past persecution can only take place in private places, the board's conclusion that Charlie did not suffer past persecution lacks substantial evidence and should be reversed. I see that my time is up. Let me just ask you one question because I'm having trouble following these things. Are you talking about the BIA decision dated July something 2014? July 18, 2014. Yes, Your Honor. Because I couldn't ever find the quotes in the paragraphs. Your Honor, if I may approach, I've got it highlighted and I've got the numbers on there for you. Just give it to the clerk, please. Thank you. He's got the numbers of his arguments. Tell me which quote you want, Your Honor. No, I see what the problem is. When you talked about page four, you were talking about page four of the record, not page four of the decision. Oh, I'm sorry, Your Honor. That's all right. That's fine. Okay, thank you. I mean, I recall the argument and I recall the decision, but I was just trying to follow it and it was always off page because page four of the record is page two of the decision. Yes, Your Honor. Okay, thank you. Thank you. Your Honors, Judge Pegerson, counsel, my name is Margaret Cuny-Taylor. I represent the government in this matter. There are a lot of loose ends which you addressed with my opposing counsel, but if I may, I'd like to start out by focusing on three germane findings that the board and the immigration judge made, which I think will straightforwardly dispose of this case. First of all, the board found and the immigration judge also found that the harm that Mr. Charlie talked about was reprehensible, but did not rise to the level of persecution. And Mr. Charlie does not dispute that finding. Second of all, the immigration judge and the board found that Mr. Charlie is a member of a disfavored group, albeit not a severely disfavored group, and the government doesn't dispute that finding. So there are already two findings which are undisputed. The third finding is whether Mr. Charlie showed an individualized risk, which he was required to do under this court's disfavored group analysis. And that finding is disputed. And if the court looks at those three findings, the path to disposition of this case is clear. Well, the question is, take the example that counsel gave here. Suppose in Germany or maybe in some other countries, a Jew was in a traffic accident and they pulled him out of the car and beat him and said, you dirty Jew. That would not constitute an act of persecution on the grounds of religion? Well, what opposing counsel is saying about public place in this decision is really... I'd like to answer the question I asked. About the Jewish... About somebody pulled out of a car or in a traffic accident and said, beaten and then said, you dirty Jew. Would that constitute an act of persecution on the grounds of religion? That would certainly constitute a reprehensible... No, no, but it's not reprehensible. I asked whether it would constitute an act of persecution on the grounds of religion. Well, we don't have that case. I know we don't have the case. Why don't you tell me you don't want to answer the question, if you don't? Or answer it, one or the other. Your Honor, I do not decide what is persecution and what isn't. Okay, never mind. What do you do for a living? What do I do? Yes, you're telling me what you don't do. What is it you are here to do? You're not here to answer the questions, obviously. I'm here to represent my client, the Department of Homeland Security. Jeff Jefferson Beauregard Sessions III. We know you're here to represent him, yes. Now, what else are you here to do, if you're not here to answer questions? Your Honor, I'm here to talk about the case. Okay, we'll just talk about the case, and we won't bother about the questions we may have. Do you have another question, Your Honor? No, there's no point in asking another question. You know what, he's asking you a hypothetical, which you should answer hypothetically. All right. Well, here is the thing. I'm not interested in hearing the answer, despite Judge Wardlaw's assistance to you. I'm just trying to be nice. Yes, well. Thank you. So can you answer the question, answer Judge Reinhart's question? Well, I was about to. I'm going to take a sip of water, because I'm a little parched. I'm actually the daughter of refugees from Austria who were Jewish. And my father, who was a wonderful man, was a poor driver. And he got called a lot of names in the United States for poor driving. This person was beaten up several times, and every time he was beaten up, the people who beat him up were calling him, you Chinese, racial slurs. So we know they had a motive against him of his ethnicity. So I think our case law is such that when there's physical harm, we consider that to be rise to the level of persecution. Well, if you look at the case of Halim, where there were similar kinds of problems, including that Halim was falsely accused of a crime and detained and beaten in prison. This court did not see an individualized risk or harm that rose to the level of past persecution. The same kind of thing you can find in Lolong and in Sing. The kind of individualized risk, which does actually link to the ethnic group and not to the general population, is the kind of thing that was in Sael, which the board was simply responding to Mr. Charlie's arguments before, and where Ms. Sael was called out by name. Let me interrupt you and go through some of this history with reference to Charlie. In 1992, when he was 10 years old, between five and seven natives beat him and stole money from him near a shopping mall, and the natives called him a Chinese pig. And in 94, native Indonesians extorted money from his father's paint business, just opened up paint business, and they came around and they said, hey China, if you want to be safe doing business here, you'll have to pay protection money. Then his father went to the local chief leader, which is a government position, who told Charlie's father to pay the protection. Then in 97, while he's riding public transportation, native Indonesians stole his money and beat him barbarically. And he was told, you dirty China, get out of Indonesia. He didn't report that to the police, because the police, he said, don't help people of Chinese ethnicity. And he's riding a motorcycle in 1999, a native puts a knife to his throat, and Charlie's wallet and his cell phone are stolen. And the same expression, hey China, surrender your wallet or I will cut you. Let's rob all Chinese. Then he's riding a motorcycle in 2002, and a native Indonesian rear-ended him. And an argument broke out between the driver and Charlie. The driver and about ten other natives beat up Charlie, and he was hospitalized and required eight stitches on his head. And they yelled at him and said, you damn China, ill China, damn China, you die. And he went to the police, and they wouldn't help him. And while he's in 05, while driving, a native Indonesian police officer collided with Charlie. When Charlie blamed the accident on the officer, the officer demanded that Charlie pay for the damages, which he did. And then the officer said, hey China, don't you know that I'm police? Don't you dare do anything with me. And Charlie testified that although the authorities take reports and ask for money, they do not investigate crimes against ethnic Chinese minorities. Now isn't that a lot of stuff? You're telling me they're all nice to them, and they don't bother them, they're very kind, huh? Your Honor, I never said they were nice and kind. Well, no, but I'm trying to give you some nice words to put in your mouth. So go ahead. All right. So let me refer you, Your Honors, to the decision in Sing. Your time is up, but we'll give you another two minutes. All right, thank you. Let me refer you to the decision in Sing, which referred to Kotosh, which is a disfavored group case. And in Sing, this court said that there is just horrible violence in the world, that it's ethnically and religiously based, and that millions of people suffer from this violence. But that's a different question from whether they're entitled to asylum under the laws of the United States. So in sum, I'd like to just call the court's attention to the fact that Mr. Charlie failed to show. He showed membership in a disfavored group. He suffered reprehensible harm, but it did not rise the level of past persecution. And he did not show, as the petitioners in Sale, Wakari, Kotosh, and Mojian, that he had an individualized risk. Because there, the petitioners showed that in addition to being a member of a disfavored group, they were also a pastor. They were members of a subgroup. They were called out by name. And that's it. We ask the court to deny Mr. Charlie's petition for review. Thank you, counsel. Do you feel the need to rebuttal? Yes, Your Honor. Why? This is one of the first lessons you're supposed to learn as a lawyer. But go ahead. All you can do is lose it from here. Yes. Your Honors are very seasoned when it comes to disfavored group status. Judge Reinhart, you wrote the decision in Cosats, which was the precursor to Sale, Wakari, Tambubolan, which Judge Pregerson extended the disfavored group analysis to the Christians in Indonesia. And last time I was here, Judge Wardlaw, you published the decision for Salim B. Lynch, which was in the individualized risk and the motion to reopen setting. What the government is doing, and they're doing in a lot of these cases, which we need guidance from the court on, is that we need you to go back and show how you did in Cosats, where you said, look, there are groups and then there are subgroups. And when you start getting to some of these groups, that individualized risk is less and less that needs to be shown. Here what the government is doing is they're pitting people against one another in the disfavored group. They're saying that, look, in all of these cases, maybe we had a pastor among the Christians or something to that nature. Let me give you another hypothetical. Thirty-eight years ago when we came to the United States as Jews fleeing Iran, the Islamic Republic of Iran, and my parents applied for asylum, we didn't have to show that we had it worse off than another Jew. That's impossible to prove. How are you going to pit members of the same disfavored group against one another? So we go back to Cosats and we say, no, it's the disfavored group against the general population. So we need guidance on that, Your Honors. Thank you. Thank you. Cases argued will be submitted.
judges: Pregerson, Reinhardt, Wardlaw